UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
LUISA M. RODRIGUEZ,                          :

              Plaintiff,         :

      -against-                      :

MICHAEL J. ASTRUE,                           :
Commissioner of Social Security,

                   :

             Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**REPORT AND**
**RECOMMENDATION**

**07 Civ. 0534 (WHP)(MHD)**

**TO THE HONORABLE WILLIAM H. PAULEY, U.S.D.J.:**

Plaintiff Luisa Rodriguez commenced this pro se action
pursuant to sections 205(g) and 1631(c)(3) of the Social Security
Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3). She seeks
review of the May 18, 2006 decision of the Social Security
Commissioner ("Commissioner") denying her application for
Supplemental Security Income ("SSI") benefits based on a finding
that she was not disabled. Plaintiff seeks an order (1) reversing
the Commissioner's determination and (2) awarding her benefits
retroactive to January 2002 or, in the alternative, remanding the
case for reconsideration.

The Commissioner has moved for judgment on the pleadings,
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, on
the ground that the denial of benefits was supported by substantial

evidence and was in accordance with applicable laws and regulations. Plaintiff filed no papers in response to the motion.

For the reasons set forth below, we recommend that the Commissioner's motion be denied and the case remanded for further consideration.[1]

I.   Procedural History

On August 26, 2004, plaintiff filed an application for SSI benefits. (Administrative Record Transcript ("Tr.") 45-49). A Disability Determination and Transmittal Form, dated August 26, 2004, listed her primary diagnosis as affective disorder and reported no established secondary diagnosis. (Id. at 36). In plaintiff's Disability Report, dated September 3, 2004, she listed her conditions as "back disorder, depression, anxiety, hypercholesterolemia and diabetes." (Id. at 57).

The Social Security Administration ("SSA") denied plaintiff's

---

[1] We note that an attorney recently filed a notice of appearance on behalf of plaintiff. He has not yet sought to file any papers in connection with the defendant's pending motion, but we assume that he will seek to be heard in connection with any objections to this Report and Recommendation.

application on November 3, 2004. (Id. at 38-41). According to the SSA, "the medical evidence show[ed] that [she had] had normal examination findings, the ability to relate to other people, the ability to care for [her] needs and the ability to travel by [herself]," and that she could therefore continue to perform her job as a cleaner. (Id. at 41). In December 2004, Rodriguez requested a hearing before an administrative law judge ("ALJ"). (Id. at 42). The hearing, originally scheduled for November 30, 2005 (id. at 175), was adjourned until March 10, 2006 to permit Rodriguez to obtain a representative. Plaintiff appeared with counsel at her March 10, 2005 hearing, which was conducted by ALJ Javier A. Arrastia. (Id. at 157, 178).[2]

On May 18, 2006, the ALJ issued a decision finding the plaintiff not disabled and ineligible for SSI payments. (Id. at 11-22A). He stated, first, that while she alleged back pain, no such impairment was medically determinable. Further, he found that her diabetes and hypercholesterolemia were not severe impairments, and in any event did not significantly affect her ability to perform work-related activities. (Id. at 19-20). As for plaintiff's mental status, he found that she did have a depressive disorder with some

_____

[2] This attorney continued to represent plaintiff on her administrative appeal (see Tr. 7-10), but is not presently representing her in this action. (See Letter from William Gottlieb, Esq., to the Pro Se Clerk, Southern District of New York, Dec. 7, 2006.).

3

anxiety, and that it qualified as a severe impairment under 20 C.F.R. §§ 416.920(b) and 416.971 et seq. Nonetheless, while he determined that this impairment imposed "moderate" limitations on plaintiff, he found that she was capable of "perform[ing] simple, routine, repetitive tasks not involving contact with the public at all exertional levels." He therefore concluded that plaintiff had presented insufficient evidence to entitle her to SSI benefits. (Id. at 19).

Plaintiff filed a request for review with the SSA Appeals Council on July 20, 2006. (Id. at 7-10). That request was denied on October 17, 2007. (Id. at 3-5).

Rodriguez filed the current action in this court on December 7, 2006 as a pro se litigant, seeking either reversal of the SSA's decision or remand. On August 6, 2007, the Commissioner responded with a motion for judgment on the pleadings. (Mem. of Law in Supp. of the Commissioner's Mot. for J. on the Pleadings ("Def.'s Mem.") 2).

II.   Factual Background

 

 

A.   Plaintiff's Reported Physical and Psychiatric Ailments

 

Rodriguez was born in the Dominican Republic and entered the United States in 1981. (Id. at 163-64). She last worked in 2003 (id. at 19), citing back pain and depression as the primary reasons for her inability to work thereafter. Plaintiff submitted several disability reports during the course of her application for SSI benefits that provided information regarding her claimed medical and psychiatric conditions. (Id. at 54, 68, 77, 96).

 

With regard to her physical ailments, Rodriguez complained of back pain, hypercholesterolemia[3] and diabetes. (Id. at 57). She said that her back pain began sometime in 2000, when she left work one day, and that the pain went from the top of her spine to her lower back. (Id. at 169). She reported that she had attended therapy -- presumably physical therapy -- for her back in 2005, but that she had to stop because she experienced chest pain. (Id.).[4]

---

[3] "Hypercholesterolemia" refers to an excess of cholesterol in the blood. Dorland's Illustrated Med. Dictionary 792 (28th ed. 1994).

[4] She provided no medical records to support her claim that she attended physical therapy at any time

She believed that the pain that she experienced was the result of the "constant movement" in which she engaged at her job. (Id. at 60).

As to her mental impairments, Rodriguez complained of depression and anxiety. (Id. at 57). In a Disability Report dated September 3, 2004, she reported that she found it difficult to concentrate on a task or to think about more than one thing at a time. An undated disability report recounted that she did not have trouble paying attention or finishing what she started (id. at 58, 74), but she did say that she has some trouble with her memory. (Id. at 75). In terms of interacting with others, she stated that she preferred not to spend time with other people, though she reported that she had no problems getting along with family, friends, or neighbors. (Id. at 73-74). She also stated that she did not have trouble getting along with authority figures, had never lost a job because of problems interacting with others, and had never had a problem because of stress or changes in schedule. (Id. at 74-75). As to her complaints of anxiety, she reported that she had trouble sleeping because she was anxious at night. (Id. at 69).

Over the course of her application process, plaintiff reported taking a number of medications, which changed over time. According to the September 3, 2004 Disability Report, she was taking aspirin

6

(as a blood thinner), Glucophage (for diabetes), Lipitor (to reduce her cholesterol levels) and Zoloft (to treat her depression).[5] (Tr. 61). In a Disability Report submitted for her appeal, she reported taking the same medications, as well as Naproxen and ibuprofen (both for back pain).[6] (Id. at 88). On a "Claimant's Medications" form dated March 10, 2006 she did not report taking aspirin, Naproxen or Glucophage, but she again said that she took Lipitor, Zoloft, and ibuprofen, and for the first time reported taking Nitroquick (.4, presumably milligrams, per day, for chest tightness), Metformin (500 mg/day, for diabetes) and Altace (2.5 mg/day, for hypertension).[7] (Id. at 95). Plaintiff reported that she drank coffee and smoked about five cigarettes per day, but denied alcohol and street-drug use. (Id. at 69, 121).

In a pre-hearing letter dated March 10, 2006, plaintiff's counsel asserted that plaintiff's medical problems included knee pain and swelling, chest pain on exertion and depression. (Tr. 93). He reported that her physical conditions "markedly limit her ability to stand and walk, and interfere with her performance of

_____

[5] In filling out this form, plaintiff did not specify her dosage for any of her medications.

[6] Again, plaintiff did not supply her dosage on this form.

[7] In this report, plaintiff did not specify her dosage of Zoloft or ibuprofen, but did say that she took 40 milligrams of Lipitor daily. (Tr. 95).

day to day household tasks," and that he expected her to testify at her hearing that she "has lost interest in most activities, has thoughts of dying and is very tired much of the time ... [and that] she has had significant memory problems." (Id. at 93).


B.   The Medical Record Before the ALJ


1.   Treating Sources


In a response to a September 15, 2004 request for medical records made by the New York State Department of Social Services, Office of Disability Determinations (id. at 100), New York-Presbyterian Hospital provided records for the period between March 1999 and August 2004. (Id. at 101-20). Some of these documents appear to relate to conditions not at issue in plaintiff's application,[8] while others address the relevant conditions.


Pertinent to her current complaints, an interpretation of a Pulmonary Function Test from March 1999 concluded that the test revealed "[n]ormal spirometry without response to acute

_____

[8] There are a series of gynecological medical records (id. at 101, 107-09, 118-20), several mammograms (id. at 108-09), and records from a colonoscopy. (Id. at 102, 105-106).

administration of bronchodilators." (Id. at 104). A twenty-four hour urine protein test, measuring the excreted protein in urine, performed in April 2004, revealed a total volume level of 600 ml and an illegible level of protein per twenty-four hours.[9] (Id. at 113). There is a lipid profile from August 2004 in which plaintiff's cholesterol level was 253 mg/dl (where the National Cholesterol Education Program classifies a cholesterol level of 239 or greater as high), and her LDL level was 164 mg/dl (where the same Program characterizes a level of 159 or above as high).[10] (Id. at 110). A hemoglobin profile from March 2004 put her result at 7.1%, where a normal range is 4-6[11] (id. at 114); a later hemoglobin test, from August 2004, is nearly illegible but appears to yield the same result. (Id. at 111). A June 2006 test of plaintiff's glucose level revealed it to be around 107 mg/dl, where a normal range is 70-110. (Id. at 112). Finally, a basic metabolic panel test from March 2004 showed all results in the normal range, except for carbon dioxide (22 mM/l, where the normal range is 25-33 mM/l) and glucose (which is illegible but highlighted). (Id. at 115).

---

[9] The normal range for the total volume of protein discharged in urine is 50-150 mg/24 hour. (Id. at 113).

[10] An earlier lipids test, from 2003, showed all cholesterol levels to be within the normal range. (See Tr. 116).

[11] An earlier hemoglobin test, from 2003, showed a hemoglobin result to be 6.8%, outside of the normal range of 4-6%. (Tr. 117).

9

Plaintiff's treating doctor was Elaine Fleck, M.D., an internist at New York-Presbyterian Hospital. (Id. at 92). It is not clear from the record when her treatment of Rodriguez began, though it was at least as early as April 2003, as reflected by medical records provided by Columbia-Presbyterian Hospital, in which Dr. Fleck is listed as the attending physician. (Id. at 101, 107-09). The administrative record contains little in the way of medical records, and the impressions provided by Dr. Fleck are sparse. In response to a request made by the New York State Department of Social Services on September 16, 2004 seeking x-ray reports, an admission history, psychiatric documents, records, and clinic notes from 2003 to 2006 (id. at 131-32), Dr. Fleck provided a single notation reporting that Rodriguez suffered from high cholesterol and major depressive disorder. (Id. at 132). In this same notation, she stated that the plaintiff's last visit was August 16, 2004, that she was stable on Zoloft, and that Dr. Fleck was not aware of any psychiatric or inpatient visits. (Id.).

At the time of plaintiff's hearing before the ALJ, Dr. Fleck submitted a letter dated March 9, 2006, stating that plaintiff suffered from diabetes, hyperlipidemia,[12] smoking, depression, panic disorder and obsessive-compulsive disorder. She listed plaintiff's

---

[12] "Hyperlipidemia" refers to "elevated concentrations of any or all of the lipids in the plasma, including hypertriglyceridemia, hypercholesterolemia, etc." Dorlands, 795.

10

medications as Zoloft, Glucophage, aspirin, Lipitor, and, for hypertension, ramipril (Altace). (Id. at 152). Plaintiff's most recent internist visit at the time, according to Dr. Fleck's letter, had been in November 2005, and her most recent psychiatric evaluation had been on January 12, 2006. (Id.). Dr. Fleck opined that "[a]t that time, she was probably unable to work. Close follow up is needed to assess her improvement, ability to work and her daily activities." (Id.).

Following the hearing, plaintiff's attorney submitted a letter to the ALJ dated March 28, 2006, in which he enclosed a report by plaintiff's treating psychiatrist, Dr. Mathew McCarthy. (Id. at 153). The report indicated that Rodriguez had been Dr. McCarthy's patient since January 2005. (Id. at 154). Dr. McCarthy diagnosed plaintiff with dysthymic disorder,[13] panic disorder, agoraphobia,[14] and obsessive-compulsive disorder. He also reported that her condition had lasted or was expected to last more than twelve months. (Id. at 154-55). He divided her symptoms into three

---

[13] Dysthymia is "a mood disorder characterized by depressed feeling (sad, blue, low, down in the dumps) and loss of interest or pleasure in one's usual activities and in which the associated symptoms have persisted for more than two years but are not severe enough to meet the criteria for major depression." Dorland's, 519.

[14] Agoraphobia is defined as "intense, irrational fear of open spaces, characterized by marked fear of being alone or of being in public places where escape would be difficult or help might be unavailable." Dorland's, 38.

11

categories -- first, depressed mood, tearfulness, insomnia and decreased appetite; second, anxiety episodes of increased heart rate, shortness of breath and tremors; and third, compulsive behavior, specifically collecting discarded objects and then hoarding them.[15] (Id. at 154). He reported that she was being treated with 100 milligrams of Zoloft daily. (Id. at 154). According to Dr. McCarthy, plaintiff's symptoms were "credible and reasonable to expect given her underlying medical condition." (Id. at 154).

Dr. McCarthy then assessed plaintiff's psychiatric limitations in accordance with the SSA regulations, which look to four areas -- activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3)-(4). Dr. McCarthy's report was completed on a form providing physicians with the options of None, Mild, Moderate, Marked, and Extreme when categorizing the severity of various social, physical, and psychological limitations, while also allowing for specific notes. (Tr. 155). In addressing plaintiff's psychiatric limitations, Dr. McCarthy characterized her impairments in activities of daily living as moderate, saying that she isolates herself and that her "grooming is somewhat deficient." (Id. at

---

[15] In his report, Dr. McCarthy characterized the objects that plaintiff collected as "disguarded objects." (See Tr. 154). We read this as "discarded objects."

12

155). In assessing her social functioning, he categorized her impairment as marked, reiterating her self-isolation and noting her habit of collecting discarded objects, a habit that apparently led to arguments with her family. (Id.). He listed her impairments in concentration, persistence and pace as moderate, noting that she has some psychomotor retardation related to her depression. (Id.). Finally, he characterized her impairment in handling a level of stress like that found on a simple job as moderate, though he did so without further comment. (Id.).

Finally, Dr. McCarthy noted that plaintiff also suffered from diabetes, which he listed as another complaint that has an impact on her ability to function normally. (Id. at 156).

2. <u>Consulting Medical Sources</u>

The record also contains a number of reports by consulting doctors. We summarize their results below.

In October 2004, plaintiff was examined by Dr. Kautilya Puri, who was identified in her profile as a neurologist but who performed a consultative internal medicine examination. (See id. at 121, 126). She listed plaintiff's chief complaint as upper-back

pain over her whole back since 2000, which plaintiff characterized as a sharp, on-and-off pain that increased with lifting weights and decreased with medication, but apparently had no other associated symptomatology. (Id. at 121). Additionally, she noted plaintiff's history of depression, anxiety, insomnia, back pain and diabetes, and reported that plaintiff smoked about five cigarettes per day and denied the use of alcohol or street drugs. (Id.). She listed the medications that plaintiff was currently taking[16] and summarized plaintiff's "activities of daily living," noting that plaintiff did occasional cooking, shopping and laundry, could bathe and dress herself daily, did not use assistive devices for walking, and was able to watch TV, read and go to church. (Id.). She then summarized the results of her physical examination, noting that plaintiff was in no acute distress, had a normal gait and could walk on heels and toes without difficulty, was able to squat fully, had a normal stance, and needed no help changing for the exam, getting on and off the exam table or rising from a chair. (Id. at 122).

Dr. Puri further noted that plaintiff's cervical and lumbar spine showed full flexion, extension, lateral flexion and full

---

[16] These included: Lipitor (20 mg/day), Metformin (500 mg/day), Zoloft (50 mg/day), Famotidine (20 mg/day), aspirin (81 mg/day), Vitamin D (1 tablet twice a day), multivitamin (1 tablet per day) and ibuprofen (600 mg as needed).

rotary movement bilaterally; there was no scoliosis, kyphosis,[17] or abnormality in the thoracic spine; and the Straight Leg Raising Test was negative bilaterally. (Tr. 123). She noted that plaintiff had full range of movement in her shoulders, elbows, forearms and wrists, as well as hips, knees and ankles bilaterally. (Id.). Plaintiff's strength was 5/5 in the lower and upper extremities, with no evident subluxations,[18] contractures, ankylosis[19] or thickening. (Id.). Her joints were stable and nontender, and Dr. Puri observed no redness, heat, swelling or effusion. (Id.). A follow-up lumbar sacral spine x-ray revealed no bony or disc space pathology. (Id. at 123, 125).

As to mental status, Dr. Puri found that plaintiff dressed appropriately, maintained good eye contact and had a normal affect. She also found that plaintiff was oriented in all spheres, showed no evidence of hallucination or delusions, showed no evidence of impaired judgment or significant memory impairment, and denied suicidal ideation. (Id. at 123).

---

[17] "Kyphosis" refers to an "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side." Dorland's, 890.

[18] A "subluxation" is an "incomplete or partial dislocation." Dorland's, 1596.

[19] "Ankylosis" refers to "immobility and consolidation of a joint due to disease, injury, or surgical procedure." Dorland's, 86.

Dr. Puri diagnosed plaintiff with upper-back pain, depression with anxiety and diabetes mellitus, and listed her prognosis as "fair." (Id. at 123).

Also in October 2004, Dr. Mayra Zoe Ortiz-Roman, a psychologist, performed a consultative mental-status examination. (Id. at 127). In her subsequent report, Dr. Ortiz summarized Rodriguez's background information, reporting that plaintiff had attended school through the sixth grade in the Dominican Republic[20] and that she had worked in maintenance in a number of city locations as well as in housekeeping, leaving because these were temporary jobs associated with receiving public benefits. (Id.). Plaintiff also told her that she lived with family and had taken public transportation to get to the appointment. (Id.). Dr. Ortiz said that plaintiff told her that she could not work because of back pain and depressive symptoms. (Id.). As to her psychiatric history, Dr. Ortiz said that plaintiff reported no history of psychiatric hospitalizations but did report a history of outpatient psychiatric treatment. (Id.). Plaintiff denied having a history of drug and alcohol use, any legal history, family psychological problems, drug use, or cognitive problems. (Id. at 128).

---

[20] Note that elsewhere plaintiff reports that she attended school through the seventh grade. (Tr. 165).

In summarizing plaintiff's current functioning, Dr. Ortiz said that plaintiff had reported that she was sleeping only four hours a night, experienced decreased appetite and decreased sexual functioning, had lost ten pounds in three months and experienced symptoms of depression. (Id. at 127). Examples cited by Dr. Ortiz were dysphoric moods, crying spells, feelings of hopelessness, loss of usual interest, fatigue, loss of energy, feelings of worthlessness, diminished self-esteem, problems with memory and concentration, diminished sense of pleasure, and past suicidal ideation (though plaintiff said that she was not presently suicidal). (Tr. 127-28). Plaintiff told Dr. Ortiz that treatment, presumably with medication, had improved her symptoms but that her symptoms were still present. (Id. at 128). Dr. Ortiz listed plaintiff's current medications as Lipitor (20 mg), Metformin ER (500 mg), Zoloft (50 mg), aspirin (81 mg) and Famotidine (20 mg). (Id.). In assessing plaintiff's mode of living, Dr. Ortiz reported that she was able to dress, bathe and groom herself; that she could prepare food, do general cleaning and laundry and go shopping herself; and that she could manage money and take public transportation. (Id. at 129). She also apparently got along well with friends and family, and spent her days doing chores, reading, watching TV and listening to the radio. (Id. at 129).

Upon examining plaintiff, Dr. Ortiz found her appearance --

17

including her personal hygiene and grooming -- and eye contact appropriate, and her gait, posture and motor behavior normal. (Id. at 128). She was oriented to time, place and person. (Id. at 129). Her speech intelligibility evidenced articulation, but the quality of her voice was unclear at times and her expressive and receptive language was inadequate. (Id. at 128). Her affect was of full range and congruent with her thoughts and speech, and her thought processes were coherent and goal-directed without evidence of delusions, hallucinations or disordered thoughts. (Id.). Though her mood appeared calm, she reported depressive symptoms. (Id.).

Dr. Ortiz noted that plaintiff's attention and concentration were impaired, saying that she was able to do counting but that she was unable to do simple calculations and serial threes. (Id. at 129). Additionally, her recent and remote memory skills were impaired; she was able to recall only two objects immediately, and after five minutes, she restated four digits forward and two digits backward. (Id.). Her cognitive functioning fell in the "below average/borderline" range. (Id.). Her insight and judgment were reported as "fair." (Id.). Dr. Ortiz indicated that plaintiff "occasionally" seemed capable of understanding and following instructions and performing simple tasks, but that she seemed unable to perform complex tasks without assistance. (Id.). She found that plaintiff appeared unable to maintain attention and

concentration for a task, attend to a routine or maintain a schedule or learn new tasks. (Id.). Nevertheless, she apparently could make appropriate decisions and could relate to others and interact appropriately with them. (Id.).

Ultimately, Dr. Ortiz found that the exam results were consistent with plaintiff's own description of her condition and that, while plaintiff's prognosis was good with continuing intervention and support, she recommended that plaintiff receive psychological and psychiatric treatment. (Id. at 130). She diagnosed plaintiff with major depressive disorder (Axis I), borderline intellectual functioning (Axis II), and diabetes, high cholesterol and back pain (Axis III). (Id. at 130).

Finally, Dr. Carlos Gieseken acted as a non-examining consulting physician for SSA.[21] In that capacity he evaluated plaintiff's medical records in order to provide a Physical Residual Functional Capacity Assessment of plaintiff. He determined, initially, that plaintiff's medical disposition fell under the category of affective disorders and that a Residual Functional Capacity Assessment was appropriate. (Id. at 134). He ultimately found a medically determinable impairment of major depression. (Id.

---

[21] We note that the record does not reflect Dr. Gieseken's specialty, if any. (Tr. 22, 134-50).

at 137).


In making this diagnosis, Dr. Geiseken concluded that plaintiff had mild functional limitations in completing the activities of daily living and had difficulty in maintaining social functioning. (Id. at 144). He found that she had moderate functional difficulties in maintaining concentration, persistence, or pace. (Id.). He found no functional limitation due to repeated episodes of deterioration of extended durations. (Id.). In his Mental Residual Functional Capacity Assessment, dated October 28, 2004, he found plaintiff not significantly limited in several functional categories related to understanding and memory -- including her ability to remember locations and work-like procedures and the ability to understand and remember short and simple instructions. (Id. at 148). He also found plaintiff not significantly limited in several categories related to sustained concentration and persistence -- including her ability to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work-related decisions, and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to

20

perform at a consistent pace without an unreasonable number and length of rest periods. (Id. at 148-49). Under the category "Understanding and Memory," he found her moderately limited in her ability to understand and remember detailed instructions. (Id. at 148). Under the category of "Sustained Concentration and Persistence," he found her moderately limited in her ability to carry out detailed instructions and her ability to maintain attention and concentration for extended periods. (Id.). In the categories of "Social Interaction" and "Adaptation," he found her not significantly limited in any area.[22] (Id. at 149).

In the text of his functional capacity assessment, Dr. Gieseken wrote that plaintiff had no history of hospitalization, that she was not currently receiving psychotherapy, that her affect was appropriate and her mood was calm, that she did exhibit impaired attention/concentration and memory, that she showed fair insight and judgment, and that plaintiff's treating physician said that she was stable on her medication. (Id. at 150). As for Dr. Ortiz's assessment of plaintiff, Dr. Gieseken found it not supported by medical evidence and the overall record. He stated, "The [claimant] exhibits the ability to understand/remember/carry

---

[22] It should be noted that there was a place to indicate that a claimant had "no evidence of limitation in this category," presumably a lower standard than that of "not significantly limited." Dr. Gieseken did not choose this standard for any of the areas on which he evaluated plaintiff. (Tr. at 149).

out simple instructions and use appropriate judgment in making simple work-related decisions. She exhibits the ability to respond appropriately to supervision, co-workers, and work situations as well as deal with some less-stressful changes in the work environment." (Id. at 150). He did concede, however, that she had moderate limitations in her ability to sustain concentration, and to understand, remember, and carry out complex tasks. (Id. at 50).

## C. The Hearing Before the ALJ

The ALJ began the hearing by asking whether plaintiff's counsel had had an opportunity to review plaintiff's file prior to the hearing. (Id. at 161). Counsel reported that the SSA was in possession of the file, and that the file "was not made available" to him because, although the ALJ's assistant had agreed to make a copy of the file, it was not ready when counsel came to pick it up. (Id.; see, e.g., id. at 92). Counsel agreed that the ALJ would tentatively admit the exhibits in the record as long as the record was kept open after the hearing to allow him to make any objections to the exhibits. (Id.). The ALJ then noted that the evidence in the record was scant, saying that more documentation of "what [plaintiff's] problems are" was needed because the "state agency found that the only ... impairment they seem to have identified was a mood disorder." (Id. at 163).

22

1.    <u>Plaintiff's Testimony</u>

Plaintiff testified that she was fifty-eight years old, born on March 3, 1948 in the Dominican Republic, and had entered the United States in 1981. (<u>Id.</u>). She completed the seventh grade in the Dominican Republic, but did not have a high-school degree and had never received vocational training. (<u>Id.</u> at 165-66). She could read and write in Spanish and could read some English. (<u>Id.</u>). Her English comprehension and speaking skills are better than her ability to read English, though she used an interpreter at the hearing. (<u>Id.</u> at 159, 165-66). She stated that she was five feet, seven inches tall and weighed 158 pounds, having recently lost a significant amount of weight. (<u>Id.</u> at 163). She said that she had lived in her apartment since 1995, and that at the time of the hearing her twenty-one-year-old daughter and her four-and-a-half-year-old granddaughter lived with her. (<u>Id.</u>). She also mentioned that she does not have to use stairs to enter her apartment. (<u>Id.</u>).

Plaintiff testified that she did not drive. (<u>Id.</u>). She had traveled to the hearing by bus, but testified that she takes public transportation only "when [she] really need[s] it," as infrequently as once every one or two weeks. (<u>Id.</u> at 165).

23

At the time of the hearing, plaintiff had no income and did not receive cash assistance or food stamps, but she was covered by some form of medical insurance or benefits. (Id.). She was not working at the time, but had had a number of different cleaning jobs in the fifteen years preceding 2003, when she ceased working. (Id. at 167). She had been a cleaner in the New York City subway and parks and had cleaned and done laundry at the Metropolitan Hospital Center and New York Presbyterian Hospital. (Id. at 166, 169). The record shows that these jobs were not paid work; instead, they were a condition of her receipt of public benefits. (Tr. 93). Further, the assignments seem to have been temporary, rather than permanent appointments. (Id.).


When asked by the ALJ why she could not work, plaintiff testified that she was "very depressed." (Id. at 167). Her depression caused her to cry frequently, and she often did not bathe or get dressed. She also often would not leave the house, not having an interest in activity. (Id.). She testified that she did not "have any love for [her] life" and that her depression caused her to make unnecessary purchases and "pick things up on the street, anything that [she found] on the street." (Id.). Plaintiff testified that she always felt depressed, and while the medication that Dr. Fleck prescribed in 2003 helped her feel better, she was taking a high dose and the doctor had increased her dosage every

time she had an appointment. (Id. at 167-68). According to plaintiff, Dr. Fleck had prescribed antidepressants because she had often seen plaintiff crying during appointments, but she had also told plaintiff that she needed to see a psychiatrist. Plaintiff did visit a psychiatrist and had also seen a psychologist, but was not seeing either on a regular basis because she needed a doctor who spoke Spanish, accepted her insurance, and was within walking distance of her house. (Id. at 168). At the time of the hearing, plaintiff had an appointment scheduled with her social worker and anticipated that her social worker might identify a suitable psychiatrist. (Id. at 168-69).


Plaintiff also said that she felt "bad," having back pain, diabetes, and chest pain. (Id. at 167). Due to these conditions, she said that she could not lift heavy objects or walk much. Her back pain had developed when she was working in the subway and had a particularly strenuous day in 2000, after which she went to New York Presbyterian Hospital. (Id. at 169). The pain that day after work reached from the top of her spine to her lower back. In 2005 she went through eight months of therapy, presumably physical therapy, to treat her back, but her doctor ordered her to stop due to her chest pain. (Id.). Plaintiff reported in an undated questionnaire submitted to the New York State Office of Temporary and Disability Assistance that she wore a belt -- not prescribed by

a doctor -- for her back while doing household chores and that her back pain prevented her from bathing as frequently as she once had. (Id. at 69, 74). Plaintiff testified that Dr. Fleck had treated her chest pain and had ordered, among other tests, a catheterization, and had told plaintiff that she should see a cardiologist every three months. (Id. at 169-70).


The ALJ also questioned plaintiff about her daily activities. (Id. at 170). Plaintiff testified that she did laundry in a washing machine and mopped the floor, although mopping took her a long time because an earlier fall had left her with knee pain that prevented her from standing for long periods. (Id.). Her back pain also limited her ability to clean the bathroom. (Id.). She occasionally cooked and was able to wash dishes, but did not shop. (Id.). Her daughter helped her when she was not able to do chores. (Id.). Plaintiff testified that she did not babysit her granddaughter but on occasion would pick her up from day care. Plaintiff's daughter both attended school and worked at the time of the hearing. (Id. at 170-71). In the undated Disability Report plaintiff reported that she went shopping approximately twice each month and went to church every week. (Id. at 71-73).


Plaintiff's counsel then questioned plaintiff regarding her work in the subway. (Id. at 171). Plaintiff testified that she

26

would clean the platform and turnstyle area with rags and strong cleaning fluids. (Id.). Counsel also clarified that plaintiff's symptoms were alleviated to a degree by her medication, but that she still felt them. (Id. at 171-72). Finally, he had plaintiff repeat that her daughter shops for her. (Id.).

2.   The Vocational Expert's Testimony

The ALJ then called a vocational expert ("VE"), Pat Green, to testify as to plaintiff's vocational profile. (Id. at 172). Based on plaintiff's statements that she had worked "in different parks ... [and] in a hospital ... in the laundry room ...cleaning and [doing] maid things," as well as her testimony about her work in the subway, the VE stated that she had enough information to identify plaintiff's prior work activities. (Id. at 166, 172). The VE said that plaintiff's work in the subway as a Cleaner II had a specific vocational preparation ("SVP")[23] of one and was unskilled,

_____

[23] "Specific vocational preparation" refers to the amount of time it takes an individual to learn to do a given job. Jeffrey Scott Wolfe & Lisa B. Proszek, Social Security Disability and the Legal Profession 163 (2002). SVP uses a scale from 1 to 9 and the higher the SVP number the greater the skill required to do the job. Id. An SVP level of one means that only a short demonstration is required to learn a job. An SVP level of two means that it takes anything more than a short demonstration, and potentially up to thirty days, to learn a job. SVP levels of one and two are both associated with unskilled work. Id.

and that the exertional level of the work was medium.[24] (Id.). Her work as a laundry worker was also unskilled medium level work, with an SVP of two, and her work as a commercial institutional cleaner, presumably referring to her work in hospitals, was unskilled heavy work with an SVP of two.[25] (Id.). However, the VE said that the actual work done by plaintiff in this capacity, based on plaintiff's testimony, might only have been medium. (Id.).

The ALJ then clarified that all work plaintiff completed was at least medium, and that the job of Cleaner II was simple, repetitive, and routine. (Id.). The ALJ also recognized that, given plaintiff's age, if he were to find her capable only of performing sedentary or light work she would necessarily have to be found disabled under the SSA regulations. (Tr. 173). He then pointed out that further treatment records would be helpful in determining

---

[24] Exertional limitations are defined by 20 C.F.R. § 404.1569a as limitations that affect a person's ability to meet the strength demands of a job. Jobs are assigned exertional levels that describe the strength required to successfully perform a job. 20 C.F.R. §§ 404.1567, 416.967. Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. 20 C.F.R. §§ 404.1567(c), 416.967(c). If someone can do medium work, presumably she can do light and sedentary work as well. Id.

[25] Heavy work involves lifting no more than one hundred pounds at a time or frequently lifting or carrying objects weighing up to fifty pounds. 20 C.F.R. §§ 404.1567(c), 416.967(d). If someone can do heavy work, she can presumably also do medium, light, and sedentary work as well. Id.

28

plaintiff's capabilities and said that he would keep the record open for 30 days in order to allow plaintiff's counsel to comment on the record and provide supplemental records. (Id. at 174).

Following the hearing, plaintiff's counsel supplied the SSA with a letter from Dr. Fleck, dated March 9, 2006. Plaintiff's counsel then provided the SSA with Dr. McCarthy's report by letter dated March 28, 2006.

D.    Standard for Benefits Eligiblity

For purposes of SSI eligibility, a person is disabled when she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[26] Carroll v. Sec. of Health and Human Servs., 705 F.2d 638, 641-42 (2d Cir. 1983)(quoting 42 U.S.C. § 423(d)(1)(A)); see also 42 U.S.C. § 1382c(a)(3)(B), 20 C.F.R. § 416.905. A person's

---

[26] Substantial gainful activity is defined as work that: "(a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1505, 404.1510, & 416.910; see e.g., Craven v. Apfel, 58 F. Supp.2d 172, 183 (S.D.N.Y. 1999); Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y. 1996).

physical or mental impairment is not considered disabling under the Act unless it is "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004)(quoting 42 U.S.C. § 423(d)(2)(A)); see also 42 U.S.C. § 1382c(a)(3)(B). In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

The SSA regulations set forth a five-step sequential process to evaluate disability claims. 20 C.F.R. §§ 404.1520, 416.920. The first step requires the ALJ to determine whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, she is considered not disabled; if not, step two requires the ALJ to determine whether the claimant has a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from a severe impairment, step three requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part

404, Subpart P, App. 1, §§ 404.1520(d)-(e), 416.920(d)-(e). If the claimant's impairment meets or equals a listed impairment, the claimant is deemed per se disabled, and an additional assessment of vocational factors such as age, education, and work experience is not conducted. If the claimant is not per se disabled, the Commissioner must consider whether the plaintiff still has the capacity to perform work. See, e.g., Bush v. Shalala, 94 F.9d 40, 45 (2d Cir. 1996). Step four requires the ALJ to consider whether the claimant's residual functional capacity ("RFC")[27] precludes the performance of her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the ALJ so finds, step five requires the ALJ to determine whether the claimant can do any other work. 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant has the burden of proof as to the first four steps, and the Commissioner bears the burden on the fifth step. See Butts, 388 F.3d at 383.

---

[27] An "RFC assessment" is defined as the most demanding work a claimant can do, despite her limitations. In determining a claimant's RFC, all medically determinable impairments must be considered, including those that do not qualify as "severe". 20 C.F.R. § 416.945(a). The assessment must be based on all relevant medical and non-medical evidence, such as physical abilities, mental abilities, and symptomology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. §§ 404.1545(a)(1)-(3).

E. The ALJ's Decision

ALJ Arrastía issued a decision finding Rodriguez ineligible for SSI benefits, as he concluded that she did not have a disability within the meaning of the Social Security Act. (Tr. 17-22A). In his decision, the ALJ applied the five-step evaluation process required by 20 C.F.R. §§ 404.1520; 404.1520a. (Id. at 18-19). He first deferred the question of whether Rodriguez had engaged in substantial gainful activity during the relevant time period, as an unfavorable determination could more easily be made at the later steps in the evaluation.[28] (Id. at 19). At the second step, the ALJ determined that Rodriguez has a depressive disorder, accompanied by some anxiety, that the condition had more than a slight impact on her ability to perform work-related activities and that therefore it was considered a severe impairment. (Id.). Conversely, he found that her physical impairments, including diabetes, hypercholesterolemia and alleged back impairments did not

_____

[28]The ALJ improperly deferred a determination under step one of the five-step analysis. The ALJ noted that plaintiff had participated in "substantial gainful activity" into 2002, but no later than that, as plaintiff's work activity in 2003 did not result in earnings that reached the threshold that constitutes "substantial gainful activity." (Id. at 18-19); 20 C.F.R. §§ 416.974 & 416.975. The record, which on this point is undisputed, reflects that plaintiff was not engaging in substantial gainful activity at any point during the period of time for which she has filed for benefits, and therefore meets the requirements of step one. The ALJ's report should accurately reflect the evidence in the record.

contribute to his finding of a severe impairment. (Id. at 19-20).
He found, first, that while Rodriguez did have non-insulin
dependent diabetes, there was no evidence that diabetes had a
significant effect on her ability to perform work-related
activities. (Id.). Moreover, he found that her glucose levels were
normal as of June 2004, though they had been low in March 2004.
(Id.). As to hypercholesterolemia, he found that while her LDLs
were high, her triglycerides and HDLs were normal and her condition
was controlled by Lipitor; moreover, he asserted that plaintiff had
not established that her hypercholesterolemia had a significant
effect on her ability to perform work-related activities. (Id. at
20). Finally, he found that plaintiff's allegation of a back
impairment was "not medically determinable," as it was never
diagnosed and an examination by a consulting physician and a
follow-up x-ray were both normal. (Id.).


      At the third step, the ALJ found that Rodriguez did not have
an impairment or combination of impairments that met or medically
equaled one or more of the listed impairments in the SSA
regulations. He found that Rodriguez had moderate limitations in
activities of daily living, social functioning and concentration,
persistence or pace. (Id. at 20). Nonetheless, because she never
needed hospitalization or otherwise decompensated mentally, and
because she was able to do basic chores, use public transportation

and get along with family and friends, she did not fulfil the criteria necessary for him to determine that she had a listed impairment, even though she had a tendency to isolate and some difficulty with her memory. (Id.). Moreover, he noted that she had no evidence of a chronic organic mental, schizophrenic, or affective disorder with a duration of at least two years that "has caused more than a minimal limitation of ability to do any basic work activity," and that the disability was therefore not as severe as any impairment listed in Appendix 1, Subpart P of Part 404. (Id.).

As a predicate to steps four and five, the ALJ found that claimant had the residual functional capacity at all exertional levels to perform simple, routine, repetitive tasks not involving contact with the public. (Id. at 20). In support of this finding, he cited Rodriguez's testimony and some of the medical evidence provided by both consulting and treating physicians.

First, he summarized Rodriguez's testimony, noting that she performs self-care activities and engages in household chores, and that she "shops, takes public transportation, goes to church, watches television, and reads." (Id. at 21).[29] He stated that

_____

[29] This assertion contradicts plaintiff's own testimony that she "cannot walk too much because [of the] pain" (Tr. 167), that

despite her testimony about the limitations attributed to her back pain, she had provided no medical evidence of the physical therapy about which she testified, and any chest pain of which she complained was found to be "not that bad" and did not appear to require immediate attention. (Id. at 20-21).

Next, the ALJ considered the records of Dr. Fleck, Rodriguez's treating internist. He noted that Dr. Fleck had provided information in 2004 that Rodriguez had diabetes, high cholesterol and major depressive disorder, and that she was stable on Zoloft. (Id. at 21). He also summarized Dr. Fleck's 2006 letter, in which she had opined that Rodriguez was probably unable to work as of 2006 but that close follow-up was needed to assess improvement, ability to work and daily activities. (Id.). Her opinion was apparently based on a January 2006 psychiatric examination as well as a November 2005 evaluation by an internist.[30] (Id. at 21, 152). The ALJ stated that, though he had considered Dr. Fleck's opinion, she had offered no findings to support her conclusion that Rodriguez probably could not work, and that in any event this was

_____

she takes public transportation "[o]nly when [she] really need[s] it," as infrequently as once every one or two weeks. (Id. at 165).

[30] It is unclear from Dr. Fleck's letter which doctor conducted the psychiatric examination. It is also unclear whether Dr. Fleck conducted the internal medicine examination herself. She was Rodriguez's treating internist for a number of years.

a determination for the Social Security Commissioner to make. Rejecting Dr. Fleck's findings, he stated that in his opinion Rodriguez was capable of performing "simple, routine, repetitive work with no public contact." (Id. at 21).

The ALJ went on to analyze the medical evidence provided by the treating psychiatrist, Dr. McCarthy, who had submitted a medical source statement in 2006. (Id. at 21). The ALJ asserted that Rodriguez had been treated by Dr. McCarthy for only two months at the time of this statement -- although this finding contradicted Dr. McCarthy's report[31] -- and that some improvement was expected with treatment. He further found that Dr. McCarthy's assessment of plaintiff's social functioning as "marked" was inconsistent with the remainder of the record, which indicated that her social functioning limitations were "moderate." (Tr. 21).

The ALJ then addressed the findings of the two consultative examining physicians, Drs. Ortiz and Puri. (Id. at 21-22). He summarized Dr. Ortiz's findings and asserted that they were largely

---

[31] There appears to be some dispute as to whether plaintiff began seeing Dr. McCarthy in January 2005 or January 2006. The ALJ assumed that Dr. McCarthy's statement that he began seeing Rodriguez in 2005 was in error and that he had intended to write 2006. (Tr. 21). Rodriguez's lawyer disputed this assumption in his letter to the Appeals Council. (Id. at 9 n.1). We make no finding on that issue at the present time, but note that this is an appropriate subject of inquiry for remand.

consistent with his own RFC determination, as she ultimately found that plaintiff's manner of relating, social skills and overall presentation were adequate, and that she was capable of performing simple tasks, making appropriate decisions, and relating to and interacting appropriately with others. (<u>Id.</u> at 22). He also mentioned Dr. Ortiz's conclusions that Rodriguez's memory skills, attention and concentration were impaired and that she exhibited symptoms of depression. (<u>Id.</u> at 21-22).

Dr. Puri's examination, according to the ALJ, also substantiated his RFC findings, in that Rodriguez's physical examination was "completely normal" and the diagnosis of depression apparently did not contradict the ALJ's determination (though the ALJ's analysis of Dr. Puri's evaluation of Rodriguez's depression is not entirely clear). (<u>Id.</u> at 22). Additionally, the ALJ found that Dr. Puri's diagnosis of upper-back pain "appear[ed] inconsistent with the findings and to be based solely on the subjective report of the claimant (and of course back pain is a symptom and not in itself a medically determinable impairment)." (<u>Id.</u>).

The ALJ also summarized the findings of Dr. Gieseken, who had examined Rodriguez's medical records and determined that she had moderate limitations in several areas but no significant

37

limitations with regard to most pertinent physical and mental abilities. The ALJ asserted that Dr. Gieseken's findings also supported his RFC determination that plaintiff was capable of simple, routine, repetitive work without contact with the public. (Id. at 22). He noted that Dr. Gieseken had found no significant limitation with respect to Rodriguez's ability to interact with others, but that he was giving her "the benefit of the doubt" in finding that she was capable only of work in which there was no significant contact with the public. (Id.).

The ALJ last considered Rodriguez's own statements with respect to the entire record, and found that while the symptoms that she reported were consistent with her medically-determinable mental impairments, the "intensity, duration and limiting effects of these symptoms," as reported by her, were not "entirely credible." (Id. at 22). He reiterated her testimony about the activities in which she was able to engage, and noted that she had left prior jobs because they were temporary and not because of any particular impairments. (Id. at 22-22A).

In considering the fourth step of the disability analysis, the ALJ compared his finding as to Rodriguez's RFC with her past relevant work, as a cleaner in a variety of public spaces, and found that she was "able to perform it as actually performed and as

generally performed." (<u>Id.</u> at 22A). Such work, both as performed by plaintiff in previous employment and as generally required by cleaning jobs, is defined as "medium work." (<u>Id.</u> at 172-73; 20 C.F.R. § 416.967(c)). He said that any limitation in social functioning, even if marked, would not preclude this past work because it involved limited social interactions with others. (<u>Id.</u> at 22A).


F. <u>The Appeals Council Decision</u>


Plaintiff submitted a request for review of the ALJ's decision by the Appeals Council on July 20, 2006. (<u>Id.</u> at 6). Her attorney attached a letter to that application, arguing that the ALJ's decision was in error. (<u>Id.</u> at 7-10). He asserted that the ALJ's decision was not supported by substantial evidence and that the record "contains persuasive evidence that Ms. Rodriguez is disabled and entitled to benefits." (<u>Id.</u> at 9-10). As support, he cited the evidence provided by examining sources, saying that the ALJ, in finding that plaintiff could perform her previous work, had failed to consider a number of functional problems cited by Dr. Ortiz, the Commissioner's own consulting psychologist. (<u>Id.</u> at 7-8). Additionally, he noted that plaintiff's treating psychiatrist had found a marked limitation in social functioning. (<u>Id.</u> at 8). Plaintiff's attorney asserted that the ALJ had "disregarded" these

reports and based his conclusion on the report provided by Dr. Gieseken, who functioned as a non-examining review doctor. (<u>Id.</u>). He noted that Dr. Gieseken himself had "failed to cite substantial evidence on which he had relied," and that "[t]he few references to supporting material he [did] make are misstated." (<u>Id.</u> at 9).

On October 17, 2006, the Appeals Council denied plaintiff's request for review and invited Rodriguez to file a civil action if she disagreed with this denial. (<u>Id.</u> at 3-5). Rodriguez subsequently filed the present action.

## III. <u>Defendant's Motion</u>

Following plaintiff's commencement of this action, defendant moved for judgment on the pleadings. He argues, first, that the ALJ was justified in finding plaintiff's physical impairments to be not severe, a conclusion supposedly supported by the findings of all of the evaluating physicians -- both examining and non-examining -- and the benign examination findings. (Def.'s Mem. 11-12). Defendant also asserts that substantial evidence supports the ALJ's finding that plaintiff retained the RFC to perform simple, routine, repetitive work that did not require contact with the public, despite a finding of a severe mental impairment. (Tr. 12). He bases

his argument on the findings of Dr. Gieseken, arguing that great weight ought to be given to the opinions of state agency medical consultants -- so long as they are supported by medical evidence of record -- because they are highly qualified individuals who function as experts in the context of SSI benefits claims. (Def.'s Mem. 13). He also argues that Dr. Puri's findings were essentially normal and therefore supported the ALJ's determination. (Id.).

Defendant argues that the remaining medical evidence also supports the ALJ's conclusion. (Def.'s Mem. 14-16). Specifically, he notes that Dr. Ortiz made some findings that were consistent with those of the ALJ, but that, as to the rest, Dr. Gieseken found that Dr. Ortiz's conclusions were not consistent with the medical evidence generally. (Id. at 14). Defendant argues further that the ALJ's conclusions were not undercut by Dr. McCarthy's findings because those impairments that Dr. McCarthy listed as "moderate" were incorporated by the ALJ in his decision-making, and his finding of a marked limitation in social functioning was not supported by the record. (Id. at 15). Moreover, even if such a marked limitation was supported by the record, defendant argues, the ALJ's decision should still be upheld because it took this into account by specifying that plaintiff should work in an environment that does not involve significant interaction with others. (Id.). Defendant also argues that the ALJ did not err by not adequately

41

considering Dr. Fleck's opinion, because the doctor did not definitively say that plaintiff could not work and, moreover, this is a decision for the Commissioner alone to make so long as it is well-supported by the clinical and laboratory diagnostic techniques and is not inconsistent with other substantial medical evidence. (Id. at 15-16). Defendant next argues that subjective symptoms are insufficient for a finding of disability and that the available medical evidence did not corroborate plaintiff's subjective symptoms "to the extent alleged," especially because some of her statements were apparently inconsistent with one another. (Id. at 16-17).

Finally, defendant asserts that the ALJ's determination of the work that plaintiff could do was consistent with her own description of her prior work and the testimony of the vocational expert. (Id. at 17-18).

Rodriguez never submitted a response to this motion.

IV. <u>Analysis</u>

A. <u>Standards for Review</u>

When a claimant challenges the SSA's denial of benefits, a court may set aside the agency's decision only if it was based on legal error or is not supported by substantial evidence. <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. Nat'l Labor Relation Bd.</u>, 305 U.S. 197, 229 (1938)); <u>Matthews v. Leavitt</u>, 452 F.3d 145, 152 n.9 (2d Cir. 2006). The substantial-evidence test applies not only to the Commissioner's factual findings but also to the inferences to be drawn from such facts. <u>See</u> <u>Caraballo ex rel. Cortes v. Apfel</u>, 34 F. Supp.2d 208, 213 (S.D.N.Y. 1999). To determine whether substantial evidence exists, the reviewing court must examine the entire record, including all conflicting evidence. <u>See</u> <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999).

It is the province of the SSA, not the courts, to weigh the conflicting evidence in the record. <u>See</u> <u>Veino v. Barnhart</u>, 312 F.3d

578, 588 (2d Cir. 2002); <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118 (2d Cir. 1998). While the ALJ need not resolve every conflict in the record, see <u>Miles v. Harris</u>, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence." <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984); <u>cf. Snell v. Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999) (explaining that the Commissioner must give reasons for the particular disposition of a claim). The ALJ must adequately explain his analysis and reasoning in making the findings on which his ultimate decision rests and must address all pertinent evidence in the record in this analysis. See, e.g., <u>Diaz v. Shalala</u>, 59 F.3d 307, 315 (2d Cir. 1995); <u>Ferraris</u>, 728 F.2d at 586-87; <u>Allen v. Barnhart</u>, 2006 WL 2255113, at *10 (S.D.N.Y. Aug. 4, 2006).

The Social Security Act explicitly authorizes the court, when reviewing decisions of the SSA, to order further proceedings when appropriate. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); <u>Butts</u>, 388 F.3d at 384. Remand is warranted where "there are gaps in the administrative record or the ALJ has applied

an improper legal standard." <u>Rosa v. Callahan</u>, 168 F.3d 72, 82-83 (2d Cir. 1999) (internal quotation marks omitted) (quoting <u>Pratts v. Chater</u>, 94 F.3d 34, 39 (2d Cir. 1996)); <u>cf. Butts</u>, 388 F.3d at 384. Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. <u>Pratts</u>, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. <u>See</u>, <u>e.g.</u>, <u>Butts</u>, 388 F.3d at 386 (discussing <u>Curry v. Apfel</u>, 209 F.3d 117 (2d Cir. 2000)).

B.   <u>Assessment of the ALJ's Decision</u>

Defendant's motion for judgment on the pleadings must be denied. We find that the ALJ's decision is, in part, not substantiated by the evidentiary record and based on legal error. We will consider the ALJ's failure to develop the evidentiary record, to give appropriate weight to the opinions of plaintiff's treating physicians, and to properly evaluate the credibility of the plaintiff. Following this, we will consider the appropriate remedy.

45